## COURT OF APPEALS
## DECISION
## DATED AND FILED

## November 9, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1659-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF693

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

EMILIO AGUIRRE, III,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Kenosha County: JASON A. ROSSELL, Judge. *Affirmed.*

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Emilio Aguirre, III, appeals from a judgment of conviction entered upon his guilty pleas. He contends the circuit court erred in denying his motion to suppress evidence. We conclude the court did not err.

### Background

¶2 One law enforcement officer from the City of Kenosha Police Department and three from the Kenosha County Sheriff's Department testified at the suppression hearing. Their relevant testimony was as follows.

¶3 Two sheriff's deputies initially responded to a trailer home after dispatch received a 911 call from an anonymous female who stated there was a man at that location with a gun. Dispatch had tried calling the woman back, but there was no answer. While on the porch outside the trailer, both deputies heard several people talking inside and smelled the odor of marijuana coming from it, with one deputy first smelling it before the trailer door was opened and the other smelling it after. One of the deputies knocked on the door as the deputies stood on opposite sides of it. A female inside asked who was there, and a deputy responded, "the Sheriff's Department." The woman opened the door.

¶4 Without entering the trailer, one of the deputies observed "[s]traight ahead of me, approximately 8-10 feet, there [were] two males by the kitchen table more or less, and then at the kitchen table appeared to be bags of marijuana and a white powdery substance in white baggies." His conclusion that the bags containing a "green substance" contained marijuana was based upon his years of experience in law enforcement, and he suspected the white substance "could be cocaine or heroin." The deputies removed the subjects from the trailer and, with the help of City of Kenosha police officers on the scene, detained them. The other deputy testified that he subsequently also observed in plain view, while standing

on the porch looking in the front door, what appeared to be illegal drugs and drug paraphernalia.[1]

¶5 One of the deputies performed a protective sweep of the trailer, going through it "just to make sure there was nobody else in the trailer as we were there for a man with a gun originally." Later, after a canine unit arrived and the owner of the trailer, Aguirre, provided consent to search it and his vehicle, both were searched, resulting in the discovery of cocaine, marijuana, and a firearm.

¶6 In cross-examining the two deputies, counsel for Aguirre showed each a photo which was taken from the perspective of a person on the porch outside of the trailer looking into it through the open door. When asked, "And the table is not visible from that view because the table would be to the right and is blocked by the open door; is that correct?" the first deputy responded, "From where this photograph was taken, yes." When then asked, "And if a person were standing in the door[way] … from the inside, … even the chair that you described would not be visible; correct?" The deputy responded, "I guess possibly depending on heights of people." When the second deputy was asked, "And the kitchen table is actually over to the right and in that photograph, it's blocked by the door; is that correct?" He responded, "According to this photograph, yes."

---

[1] This deputy more specifically testified that he observed:

> [o]n the table … like, some pipes and baggies … and there was also a chair next to the table that had like a fire safe on it that was probably about the size of a shoe box and that was open. There were bags in there which contained a green substance that later tested positive to be marijuana and then also would appear to be cocaine or some other kind of white powder.

¶7      A City of Kenosha detective testified that after Aguirre had been removed from the trailer, the detective spoke with him in the back of a squad car. The detective informed Aguirre who he was and that he wanted to search the trailer and asked Aguirre for consent to search it, which Aguirre provided. The detective "read to him the preprinted document that our department uses for consent searches and he signed the form after I read it to him giving me permission to search the trailer." Presented with a copy of this consent to search form at the hearing, the detective concurred that the form included language indicating Aguirre had a "right to refuse a search … under the Constitution" and, according to the form and the detective's related testimony, it indicated Aguirre was consenting to "a complete search of my premises [and] automobile" "without a search warrant."

¶8      The detective confirmed he made no threats or promises to Aguirre to induce him to sign the form. When asked, "Was he under any duress or coercion or any undue influence to get him to sign this document?" The detective responded, "Not by me, sir." The detective agreed that as far as he could tell, Aguirre made "a knowing and intelligent and voluntary decision to sign" the form. The detective participated in a search of the trailer leading to the evidence underpinning the numerous felony charges related to this appeal. The detective agreed that the cocaine he found in the trailer was "in plain view" and "visible from the entrance door" to the trailer such that "if you had stood right outside the entrance and the door [to] the interior of the trailer was open," it was visible.

¶9      On cross-examination, the detective acknowledged that Aguirre had told him that he "had some health concerns," specifically related to "being on a transplant list"; he made comments to Aguirre similar to "I want to be able to demonstrate to the Court, your probation officer, everyone else involved that you

were cooperating with us; okay" and "[l]ike I told you, when I was in the house, clearly there w[as] some cocaine, some marijuana. We want to continue searching"; and the squad car doors were locked so that neither Aguirre nor the detective could exit without someone opening the door from the outside. The detective acknowledged that Aguirre was emotional when law enforcement was speaking with him but added that "it was [not] out of the ordinary to see someone acting that way." The detective was shown the photo from the porch looking into the trailer through the open door and asked "there's no view of the kitchen table; is that correct?" To which the detective responded, "Well, not from that picture. The picture looks like it's taken [from] some distance."

¶10 A detective from the Kenosha County Sheriff's Department testified that he had assisted with the search of the trailer and took a one-page written statement from Aguirre the following day. That statement was introduced at the hearing and reflects that Aguirre told the detective "I was cooperative and *let* [law enforcement] inside, and they saw weed and cocaine in my trailer" that belonged to him and "not anyone else[]." (Emphasis added.) When asked, "So in the statement the Defendant indicates that he allowed the officer inside his residence?" The detective responded, "Yes, sir. He *let* them inside were his words." (Emphasis added.)

¶11 Following testimony, the circuit court denied Aguirre's suppression motion. Because of shortcomings with the photo looking into the trailer—particularly "distance and angle"—the court found unpersuasive the efforts of Aguirre's counsel to undermine the deputies' testimony that they observed drugs in plain view while standing outside the front door on the porch.

> It was not testified to by either deputy that this
> represented the exact view that they had, and to be honest

> with you, the distance from the doorway to what appears to be the camera, the Court can estimate maybe four or five feet, and does not show what is there [to] the right of the open door…. [I]t is not clear from the testimony at which angle the officer[s] were looking. The angle of the photograph is straight up. It is common knowledge that if you were looking from the left side of the doorway you would see more of the room to the right. If you were looking on the right side of the door way you would see more of the room to the left. It was not clear in the testimony from either officer[] … in what position they were in relation to [the photo].

The court found that the photo did not discredit the deputies' testimony that they observed drugs inside the trailer while standing on the porch. The court additionally concluded that Aguirre voluntarily provided law enforcement with consent to search his premises.

¶12 Aguirre appeals, challenging the circuit court's denial of his suppression motion.

### *Discussion*

¶13 On appeal of a circuit court's denial of a motion to suppress evidence, we review the application of constitutional principles to a set of facts, which is a question of constitutional fact. *State v. Dearborn*, 2010 WI 84, ¶13, 327 Wis. 2d 252, 786 N.W.2d 97. "We accept the circuit court's findings of fact unless they are clearly erroneous," but "application of constitutional principles to those facts is a question of law that we review de novo." *Id.*; *State v. Verhagen*, 2013 WI App 16, ¶17, 346 Wis. 2d 196, 827 N.W.2d 891. A warrantless search is generally unlawful; however, an exception to this general rule allows for such a search if authorized by the consent of an owner of the premises. *State v. Matejka*, 2001 WI 5, ¶17, 241 Wis. 2d 52, 621 N.W.2d 891; *State v. Wallace*, 2002 WI App

61, ¶17, 251 Wis. 2d 625, 642 N.W.2d 549, *overruled on other grounds by **State v. Popenhagen***, 2008 WI 55, 309 Wis. 2d 601, 749 N.W.2d 611.

¶14　　Aguirre's first complaint on appeal is that law enforcement was drawn to his home based upon an anonymous tip. He asserts that "[g]iven this barely bare-bones alert, the police had no business going to Aguirre's house and conducting a warrantless search." This issue is easily dispatched as the search certainly was not based upon the anonymous tip; it was based upon an experienced law enforcement officer observing illegal drugs in plain view and Aguirre subsequently providing consent.

¶15　　Moreover, just like any other member of the public could have done, law enforcement lawfully approached the trailer and knocked on the door, the voluntary opening of which led to the discovery of the incriminating evidence that justified removal of the individuals from the trailer. *See **State v. Edgeberg***, 188 Wis. 2d 339, 347, 524 N.W.2d 911 (Ct. App. 1994) ("[I]f police use normal means of access to and from the house for some legitimate purpose, it is not a [F]ourth [A]mendment search for police to see from that vantage point something in the dwelling."); ***State v. Wilson***, No. 2020AP1014-CR, unpublished slip op. ¶20 (WI App May 11, 2021) ("In ***Florida v. Jardines***, 569 U.S. 1, 133 S. Ct. 1409 (2013), the United States Supreme Court recognized the constitutionality of the knock and talk exception to the Fourth Amendment's warrant requirement. ***Jardines*** explained that an 'implicit license' exists that allows visitors to 'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.' ***Id.*** at 8. Accordingly, law enforcement without a warrant may approach a home and knock because that is no more than what a private citizen may do. ***Id.***; *see also*, ***State v. Edgeberg***, 188 Wis. 2d 339,

347, 524 N.W.2d 911 (Ct. App. 1994) (observing that police may enter areas of the curtilage that are impliedly open to use by the public).").

¶16    Aguirre next challenges the law enforcement officers' testimony that the drugs were observed in "plain view" while they stood on the porch. While we need not address this contention because Aguirre does not sufficiently develop an argument that the circuit court erred with its determination, based squarely on the multiple officers' testimony, that the drugs were observed in plain view while they were lawfully standing on the porch, *see **ABKA Ltd. P'ship v. Board of Rev.***, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) ("This court will not address undeveloped arguments."), we will nonetheless address it. As indicated, three law enforcement officers testified that the drugs were observed from the position of standing on the porch. A review of the photo relied heavily upon by Aguirre's counsel at the suppression hearing shows that the photo is lacking because, just as the court indicated, the "distance and angle" of the photo is different than what the officers would have observed while directly standing on the porch.

¶17    A sheriff's deputy testified that he and the other deputy were standing on opposite sides of the door when they knocked on the door and an occupant opened it. Common sense informs that this positioning would present different angles than that shown in the photo, which, as the circuit court stated, shows only a straight on shot into the trailer from several feet away from the door. We agree with the court that "it is common knowledge that if you were looking from the left side of the doorway you would see more of the room to the right. If you were looking on the right side of the door way you would see more of the room to the left." The court found the deputies' testimony "that … they were able to see in plain view these items of narcotics in the trailer" credible and not undermined by the photo. We see no error here.

8

¶18 Lastly, Aguirre contends that his consent for law enforcement to search the trailer "was made under duress and based on a false promise," because he was locked in the squad car, "told cooperating with the police would get him favorable treatment" with his probation agent, and told "that they had already found marijuana and cocaine in the house." While we need not address this issue as it too is completely undeveloped, we nonetheless will.

¶19 On appeal, an appellant bears the burden to demonstrate how the circuit court erred. *Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381. Aguirre has not met this burden. The court determined that neither the suggestion by the city detective that it would be in Aguirre's interest to cooperate nor the statement that drugs had already been observed in the trailer "overbore the voluntariness" of Aguirre's consent. We agree. In his interview the day after the search, Aguirre signed a statement, the voluntariness of which is not challenged on appeal, plainly stating that he "let" law enforcement search his trailer. There is no indication in that statement or other evidence presented at the hearing that he felt compelled to do so. The fact that Aguirre was informed of an incriminating and lawfully obtained fact (the discovery of illegal drugs in the trailer), reminded of the obvious (that cooperation with law enforcement would be viewed more favorably), and spoken with in the back of the squad car—even if he also had "some health concerns"—do not indicate that this otherwise completely voluntary-appearing consent was anything other than that.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2019-20).